FIFTY-FIRST ANNUAL REPORTS, 1899.        1285

Minge & Co. vs. Barbre; Southern Cotton Oil Co. vs. Barbre.

No. 13,154.

C. H. MINGE & CO. VS. S. BARBRE; SOUTHERN COTTON OIL CO. VS. S. BARBRE (CONSOLIDATED).

### SYLLABUS.

1. Under the laws of this State, the property of the debtor is the common pledge of his creditors, and no combination between such debtor and a particular creditor, whereby the latter is given an unfair preference over other creditors, whether to be made effective through the machinery of the courts, or otherwise, will be tolerated.
2. The privilege of the furnisher of money and supplies is to be restricted within the limits of the law and of the contract made by him, and where by the terms of the contract, it appears that a certain amount is intended to be secured, the privilege will be considered exhausted when that amount has been realized by the creditor from products to which the privilege attached.
3. When the furnisher of money or supplies is claiming a privilege, contradictorily with other seizing creditors, the burden of proof is on him to show that the products on which the privilege is claimed are those which the money or supplies furnished by him were used to produce.

ON APPEAL from the Tenth Judicial District Court for the Parish of Avoyelles. *Cullom, J.*

*J. C. Cappel* for C. H. Minge & Co., Plaintiffs and Appellees.

*A. V. Coco* for Southern Cotton Oil Company, Plaintiffs and Appellants.

*W. A. Morrow,* for S. Barbre, Defendant and Appellee.

Argued and submitted May 4, 1899.
Opinion handed down May 29, 1899.

---

The opinion of the court was delivered by MONROE, J.

STATEMENT OF THE CASE.

It is proved in this case that in April, 1898, A. F. Collins, of the parish of Avoyelles, introduced S. Barbre, of the same parish, to his (Collins') brother-in-law, Chas. A. Francis, a member of the firm of C. H. Minge & Co., factors of New Orleans, with a view to Barbre's obtaining advances to enable him to make a crop of cotton "on the plantation known as Haygood & Porot, and all other lands cultivated *and advanced* by him in said parish;" that a contract was, accordingly, made May 21st, 1898, whereby Minge & Co. agreed to advance $2500, for which Barbre gave his note, indorsed by Collins, payable November 1st, 1898, and secured by the pledge accorded to furnishers of money and supplies by Act No. 66 of 1874, and that he agreed to ship to Minge & Co., not less than five hundred bales of cotton. The record shows that the contract was registred, but does not show the date of registry.

It further appears that during the season of 1898, and after this contract was made, Barbre shipped to Minge & Co., a total of one hundred and forty-five bales of cotton, which realized $3,291.04; that he remitted to them a draft for $1400, received by him from the Southern Cotton Oil Co., the proceeds of which were placed to his credit; and, that he drew upon them for various amounts, aggregating $5,697.41, exclusive of a certain sum of $1400, being proceeds of the draft of the oil company above mentioned, and about which there is some dispute. The balance claimed at this time by Minge & Co., and not disputed by Barbre, is $2499.50.

The note given by Barbre, in May, having matured, and the balance due not having been paid, it was replaced by a new note for a like amount, payable December 15th, 1898, also indorsed by A. F. Collins; and the old note was surrendered.

In the meanwhile, upon October 24th, 1898, Barbre, by written contract, sold to the Southern Oil Cotton Co., three hundred tons of cotton seed, at $7.00 per ton, and received as part payment, in advance, the draft for $1400 above mentioned. It is undisputed that this draft was remitted to, and collected by Minge & Co., and the proceeds figure upon the account between that firm and Barbre. It is claimed by

Minge & Co., that said proceeds were paid, upon Barbre's draft, to J. C. Collins, though from Barbre's account, produced by them, it appears, if we understand the entry correctly, that the payment was made upon the draft of J. C. Collins. This J. C. Collins, it is shown, is a brother of A. F. Collins. It is not altogether clear that he was twenty-one years of age at the date of these transactions, nor is there anything to show that Barbre was his debtor, or to explain why this money was paid to him, if paid it was, upon the 28th of October, 1898.

According to the recital in the contract, the three hundred tons of seed sold by Barbre to the oil company were then "stored in Griffin Gin and Warehouse on F. Gumble's plantation;" as a matter of fact, however, Barbre appears to have had only about seventy-five tons of seed, all told, and the oil company has, as yet, received none of it, nor has the company recovered any part of the money paid on account of the purchase price.

Some time in November, 1898, Putnam & King, merchants of New Orleans, sued Barbre, in the District Court of Avoyelles, on his note for $169.55, dated August 10th, 1898, and made payable on or before October 1st of that year, and obtained judgment, by confirmation of default; and, after the expiration of the delay for suspensive appeal, issued execution and seized "about twelve bales of cotton in field; sixteen sacks of cotton; two plows, one cultivator, one iron safe, one store and bar room, about seventy-five tons of seed at gin, and one red mule."

This seizure appears to have been made December 3rd, 1898. Upon December 5th, following, Barbre, accompanied by A. F. Collins, appeared in the office of J. C. Cappel, an attorney in Marksville, the parish seat of Avoyelles, and agreeably to an understanding arrived at through previous correspondence with them, signed a confession of judgment in favor of Preston & Stauffer, of New Orleans, for $311.38, with a stipulation for stay of execution until October 25th, 1899, Mr. Cappel receiving a fee of $10.00 for his services, and reserving his claim to an additional fee when the judgment should be satisfied. Court was not open, and the confession could not, then, be proved up; it therefore remained in the hands of Mr. Cappel, and no judgment was obtained upon it until February 25th, 1899. Immediately upon the signing of this confession, Barbre and Collins came to New Orleans, and upon the following day, December 6th, called together, at the office of C. H. Minge & Co., and had an interview with Mr. Fran-

cis, who called in Mr. Minge, and, thereafter, brought about an interview with the attorneys of his firm. The question was considered whether Minge & Co. should accept a confession of judgment from Barbre, but it was thought that such a course would not be advisable in the interest of Minge & Co., and it was finally concluded, as between Francis and his attorneys, that Minge & Co. should proceed, at once, by attachment. It is said by Francis, that Barbre was not a party to this conclusion, but that he merely gave that gentleman to understand that Minge & Co. would take such steps as were necessary for the protection of their interests.

Be that as it may, on the evening of the same day, December 6th, Barbre, Francis and Collins left New Orleans on the same train, going towards Marksville, and while traveling, discussed the business in which they were interested. How much or how little does not clearly appear. When the train reached Bunkie, about seventeen miles from Marksville, and the point at which passengers leave the main line in order to reach that place, Francis left the train and went on to Marksville by some other conveyance. Barbre and Collins remained on the train in order to reach their homes, or a point nearer to their homes. The next morning, December 7th, Mr. Cappel, the attorney whose name has been mentioned, at the instance of Francis, filed the present suit, on behalf of Minge & Co., and caused writs of attachment and sequestration to issue, under which there was seized everything belonging to Barbre, that could be found, including most of the property already seized under the *fieri facias* issued by Putnam & King.

This seizure was facilitated by Barbre and Collins, who, together, pointed out the property, and Collins was appointed custodian or keeper.

There is no suggestion in the record that either Barbre or Collins had any other business in New Orleans on December 6th, or that they transacted any other business, than to inform Minge & Co. of the condition of Barbre's affairs, and it distinctly appears that it was the information thus given which induced Minge & Co. to institute this suit and make the seizure which is the subject of the present controversy.

For the defence of the suit thus instituted by Minge & Co., Mr. Cappel, their attorney, selected a young member of the bar who occupies a desk in his office, and who, for answer, copied a form of general

denial, prepared by Mr. Cappel, and it was Mr. Cappel who suggested the amount of the fee to be charged for this service.

Following these proceedings, the Southern Cotton Oil Co., on December 13th, instituted suit against Barbre to recover the $1400 paid him, as heretofore stated, and against Minge & Co. and Barbre, attacking the proceedings of Minge & Co., as giving that firm an unjust preference; and said company prays that the said seizure, made by Minge & Co., be set aside, and that the attachment which it, the oil company, caused to be issued, be maintained. To this, Minge & Co. answered, denying the charge of collusion and fraud, and claiming damages in reconvention, as for libel, in the sum of $3000. Barbre also answered, setting up an elaborate defence, likewise prepared, as we understand it, by the counsel representing Minge & Co., and claiming damages for libel.

The two cases, that is to say, the suit brought by Minge & Co., and that brought by the oil company, were consolidated. When they were called for trial, counsel for the oil company made a sworn application for a continuance, on the ground that Mr. Texada, a witness whom he had endeavored to subpoena, was unexpectedly absent, but had gone to Lake Charles, where his testimony could readily be taken. The counsel stated in his motion that he expected to prove by Texada that he, Texada, Barbre and A. F. Collins were partners in the general merchandizing and advancing business on Bayou des Glaises, in the parish of Avoyelles, and that Barbre, as manager of the firm, did a general advancing business on cotton with various small farmers, and received cotton in settlement of their accounts. The continuance was refused on the ground that the testimony would be cumulative, inasmuch as Barbre and Collins were present, and were capable of testifying to the facts proposed to be proved by Texada.

There was judgment in favor of Minge & Co., and against Barbre, as claimed, maintaining their writs and condemning the oil company to pay them $500 damages. There was also judgment in favor of the oil company against Barbre for $1400, but setting aside the writ of attachment issued by said company. The claim of Barbre against the oil company for damages, seems to have been ignored. The oil company has appealed.

OPINION.

An intelligent appreciation of the facts disclosed in the record

leaves no room for doubt, as we think, that Barbre and Collins came to New Orleans on the 6th of December, for no other reason than to bring about the seizure which was made upon the following day by Minge & Co. It seems to us equally clear that it was the information imparted, and the representations made by them, to Minge & Co., which induced that firm to make the seizure, and that the purpose of Minge & Co., and of Barbre and Collins, was thereby to protect Minge & Co., and Collins, as Barbre's indorser, as against the claims of other creditors of Barbre. The testimony, and the facts disclosed in the record, give color to the suggestion that Collins and Barbre were partners, and if we considered the determination of that question essential, we should be disposed to remand the case for the purpose of obtaining the testimony of Texada.

As it is, however, we are of opinion that the result would be the same whether Collins be regarded as Barbre's partner, or whether we regard him in the light of his interest as Barbre's indorser, whose obligation is reduced in proportion as Minge & Co., succeed in the enforcement of their claim.

It is true that there is a disclaimer on the part of Minge & Co., of any collusion with Barbre; and of any intention to obtain an unfair preference over other creditors; but, this is coupled with the statement that they were acting for the protection of their own interests, from which we gather that they view the question as to what is fair and what is unfair, where the protection of one's interests is involved, from a business, or perhaps, from a moral, standpoint, rather than as a legal question which is to be determined by the law of Louisiana. It may, with truth, be said, that for a debtor to give a preference to one creditor over another, is not in itself wrong, and is not fraud in a moral sense, since it is permitted in many of the States of the Union, but that does not help the matter so far as this case is concerned. With us, the property of the debtor is the common pledge of his creditors, and any arrangement, whether through the machinery of the courts, or otherwise, whereby the debtor unites with one creditor to give such creditor an advantage over others, is in violation of the prohibitions of the law; and will not be permitted to stand. *Newman vs. Baer & Levy, 50 Ann., 340; Block vs. Marks, 47 Ann., 107; Simon & Co., vs. Newman, 50 Ann., 354; Haas vs. Haas, 35th Ann., 885; Muse, Syndic, vs. Yarborough, 11th Ann., 530; Civil Code, 1969, 1970, 1977, 1983, 1984, 2053.*

So far as the record shows, there was not sufficient legal ground for the seizure as made by Minge & Co., on the 7th of December, 1898.

It is true that Putnam & King had obtained judgment, by confirmation of default, on a claim for $169.55; and had made a seizure under execution; but, no one suggests that that judgment was obtained by collusion, and from the fact that Barbre seems to have been doing his best to defeat its execution, it appears not unreasonable to believe that his failure to defend the suit was the result of negligence or inadvertence.

It is also true that on December 5th, 1898, Barbre signed a confession of judgment for $311.28 in favor of Preston & Stauffer, but it was coupled with a stipulation for stay of execution, until October 25th, 1899, nor could the confession at that time be made the judgment of the court, since the court was not in session; and, as a matter of fact, judgment was not obtained until February 25th, 1899. In the meanwhile, Minge & Co., after concluding that a confession of judgment in their favor, untramelled by stay of execution, would not protect their interests, seized everything out of which Preston & Stauffer could possibly hope to realize, upon the averment, among others, that Barbre was giving, or about to give an unfair preference. It is not difficult to see who, as between Preston & Stauffer, and Minge & Co., obtained the preference, or who has the best cause of complaint.

Mr. Francis being asked, upon direct examination, what his grounds for attachment were, answered:

"I had positive evidence he had diverted cotton; in the next place, he had wilfully misled us as to his condition, and, thereby, allowed other creditors to seize property on which we were privileged creditors, and after I got to Marksville, I found out that he had confessed judgment, of which things I have no knowledge." (?)

Being asked upon cross-examination, where he obtained his positive information in regard to the diversion of cotton, he answered that he obtained it after Barbre came to New Orleans, and the examination then proceeds as follows:

"Q.—How long afterwards was it that you got the information?

"A.—About ten minutes afterwards; ten minutes after he came and saw me.

"Q.—When you became aware of the fact that he had been diverting his cotton?

"A.—Yes, sir.

"Q.—From whom did you get that information?

"A.—From Mr. Collins."

It may be remarked, that it is not pretended that Barbre was not present at the conversation to which the witness refers.

Elsewhere, the same witness testifies, as follows, to-wit:

"Q.—State to the court the cause for which you had this attachment issued.

"A.—On or about the 6th day of December, Mr. Barbre came to the city and came into our office and informed me that he was being sued and seized, and that he would not be able to pay his indebtedness to our firm. This was a great surprise to me, as, by his letters, he had given me to understand that he owed no outside debts, that he owed no outside creditors, and that he would have ample cotton to ship to meet his obligations to my firm."

Speaking of the conversation between Barbre, Collins and himself, and in answer to a question, whether Collins had not told him that he had better take action to protect himself, he said: "I want to give you the conversation as near as I can, I do not remember exactly the conversation that took place. I was dumbfounded at the condition of affairs when he informed me what the condition of Barbre was."

\*        \*        \*        \*        \*        \*        \*        \*        \*

"Q.—Up to that time you were at least under the impression that he was solvent, and would be able to pay his account?

"A.—Yes, sir; from his own statements; I acted immediately after he told me his condition."

All that the witness knew, therefore, concerning any diversion of cotton was from the statement of Collins, when Colins, accompanied by Barbre, called on him on December 6th, and there is no other evidence in the record on that subject; and, if he had been misled as to Barbre's condition, he only discovered it at the same time, and from the same source, i. e., through the statement which Barbre himself, and Collins, had come to New Orleans to make, for the special benefit and advantage of C. H. Minge & Co., or, of that firm and A. F. Collins.

It does not appear that Barbre or Collins considered it worth while to give any such information to the Southern Cotton Oil Co., though, as that company seems to have had an agent in the parish of Avoyelles, such information might, perhaps, have been given without the trouble and expense of the trip to the city; nor did they give such information

to any other creditor. Mr. Francis, however, as he says, acted immediately upon the information furnished him. He was in Marksville the next day. Mr. Cappel, whom he employed, showed him, he says, the confession of judgment which had been signed by Barbre in favor of Preston & Stauffer, and then caused the writs to issue under which everything belonging to Barbre was pointed out by that gentleman and Collins, the two still acting together, and seized, including the cotton seed already seized by Putnam & King, and which had been bought and paid for by the Southern Cotton Oil Co.

Concerning his journey to Marksville, Mr. Francis says:

"Q.—Did you not return from New Orleans to Marksville with Collins and Barbre?

"A.— No, sir; I did not."

At a later period, in the cross-examination, we find the following:

"Q.—You took the night train of the 6th, and arrived here on the 7th, and Mr. Cappel prepared the petition, and filed the suit that day?

"A.—I know he entered proceedings that day.

"Q.—After you filed that suit, where did you go?

"A.—I went back to Bunkie.

"Q.—You did not go to Barbre or Collins' place?

"A.—No, sir.

"Q.—Was Collins in the parish at the time you took out this writ?

"A.—I do not know.

"Q.—Who came upon the train to Bunkie with you; did Barbre and Collins come on the train to Bunkie with you?

"A.—Yes, sir; I got on the train and found Barbre and Collins on the train.

"Q.—Why did you not tell me that, when I asked you about it before?

"A.—You asked me if they came to Marksville with me; that was your question."

He further testified that they all occupied quarters in the sleeping car.

Now, as the trip from New Orleans to Bunkie covered, probably, nine-tenths, or more, of the whole distance from New Orleans to Marksville, the answer "No, sir, I did not," to the question first propounded: "Did you not return from New Orleans to Marksville with Collins and Barbre?" might have been somewhat fuller. However, we have the fact that the three gentlemen traveled from New Orleans to

Bunkie together. As to what took place *en route*, Mr. Francis says, (speaking of Barbre):

"Q.—Did you talk about his indebtedness?

"A.—I was pretty sore about it and went to bed; I was coming up here to act.

"Q.—Barbre knew that you were coming to act?

"A.—I told him that I was going to protect my interest.

"Q.—Well, what did he say to that?

"A.—Not anything that I know of."

And then it appears, that, in the suit that was filed, Barbre was content to be represented by a young gentleman whom he had never seen, and who was selected by the plaintiff's attorney, in whose office he occupied a desk, and who filed a general denial copied from a form prepared by that attorney. We are not disposed to criticize this young member of the bar because, as between his client and Minge & Co., the former had perfect right to acquiesce in the proceedings of the latter, and counsel are usually guided by the information which they obtain from their clients. There seems little room for doubt, under the circumstances, however, that Barbre did acquiesce in all that was done.

Nay, more, that he and Collins, instigated the whole proceeding, and that Francis, for Minge & Co., co-operated with them.

We are of opinion, therefore, that the purpose and effect of the seizure, by attachment and sequestration, made in behalf of C. H. Minge & Co., was to give to that firm an unfair preference, within the contemplation of the law of this State.

It may be said that, if not entitled to a privilege on the property seized, as the result of the seizure, Minge & Co., are so entitled by reason of the law as applied to their contract.

The obligation, to secure which the privilege was accorded, was limited to $2500. This was the total amount, and the only amount specified in the contract, and, if there had been $10,000 worth of cotton to which the privilege applied, on Barbre's plantation, the plaintiffs,· Minge & Co., could, as between themselves and other seizing creditors, have enforced their privilege to the extent of $2500, and no further. As the matter stands, they have received from Barbre, according to their account, one hundred and forty-five bales of cotton, and have sold the same for $3291.50, and, crediting the shipper with that amount, in account current, they still claim a balance of $2499.50, for

which they have obtained judgment with recognition of privilege on the cotton and seed seized.

We think it a reasonable proposition that privileges should be re-stricted within the limits fixed by the law, and by the parties them-selves. If Barbre had intended to secure a greater sum than $2500; or if Minge & Co. had intended to advance more than that amount, and wanted the additional advances to be secured by the privilege by which the $2500 was secured, it is fair to suppose that such intentions would have been expressed in the contract into which they entered. As it is, Minge & Co. were secured to the amount expressed in the con-tract, to-wit: $2500, and the whole crop, to make which the money advanced was used, remained pledged to them up to the time that it yielded them that amount, when their right of pledge was exhausted. *Gay & Co. vs. Pike, 30 Ann., 1332.*

Another difficulty which confronts the plaintiffs is this: The privi-lege claimed attaches only to the crop which the money or supplies advanced, have been used (by the person to whom they were advanced) to make.

In the case before us, it appears, from the terms of the contract sued on, that Barbre, to whom the advances were to be made, wanted, and obtained, them, not only for such planting as he, himself, might do, but also, to enable him to make advances to others. The language of the contract is "to enable him to plant, gather, cultivate and raise a crop of cotton on the plantation known as the Haygood and Porot and all other lands cultivated *and advanced* by him in said parish," etc., etc.

We are not to suppose that the words *"and advanced,"* were used without a purpose, or that they escaped the attention of either of the contracting parties.

Beyond this, the evidence shows that Barbre was engaged in general merchandizing, and, from these circumstances, taken together, it may fairly be inferred that he acquired cotton and other products by other means than as the result of his own farming or planting. This being the case, it becomes particularly necessary, in order to justify the maintenance of the plaintiffs' privilege, upon the basis of their contract, that they should show that the property upon which the privilege is claimed is within the terms of that contract. But this has not been done. In fact, the petition of the Cotton Oil Co., is the only place in the record where the specific property seized by Minge &

Co., is mentioned, and we are not able to say, from the information thus afforded, whether Minge & Co. have, or ever had, any privilege on that property.

These considerations will, however, affect the decree only in so far as may be necessary for the case of the attacking creditor. As between Minge & Co. and Barbre, the latter has not appealed, is not complaining, and there is no reason why the seizure should not be maintained.

For these reasons, it is ordered, adjudged and decreed that the judgment appealed from, in so far as it dissolves and sets aside the attachment issued on behalf of the Southern Cotton Oil Company; and in so far as it maintains the attachment, issued on behalf of C. H. Minge & Co., to the prejudice of the claim and attachment of said Southern Cotton Oil Company; and in so far as it condemns said Southern Cotton Oil Company to pay said C. H. Minge & Co., the sum of five hundred dollars, and to pay costs, be annulled, avoided and reversed. It is now further ordered, adjudged and decreed that the writ of attachment issued in behalf of said Southern Cotton Oil Company be maintained and recognized as entitling said company to be paid, by preference over said C. H. Minge & Co., the full amount of its claim, with interest and costs, from the proceeds of the property seized under the writs issued in these cases, or either of them. It is further ordered that all costs of these cases since their consolidation, together with the costs of the appeal, be paid by C. H. Minge & Co,. and, it is further ordered, that in all other respects, not in conflict with this decree, the judgment appealed from be affirmed.