No. 2680

Second Circuit

FEDERAL LAND BANK OF NEW ORLEANS v. GREEN ET AL.

(July 1, 1929. Opinion and Decree.)

Atkins & Meadors, of Homer, and George Janvier, of New Orleans, attorneys for plaintiff, appellee.

W. D. Goff, of Arcadia, attorney for defendants, appellants.

ODOM, J. Hazard Green mortgaged his land in Claiborne Parish to the Federal Land Bank, of New Orleans, on July 18, 1919, the mortgage being duly recorded in the mortgage records. Subsequently, on October 6, 1921, he mortgaged the same property to Hamner & Company, Ltd., a mercantile corporation, to secure past due indebtedness. He failed to pay his taxes for the year 1922, and the property was sold at tax sale· on June 16, 1923, Hamner & Company, the second mortgage creditor, being the purchaser.

By the present suit, the Federal Land Bank seeks judgment against Hazard Green for the balance due on its mortgage, and judgment against Green and Hamner & Company decreeing the tax sale to Hamner & Company null, void and of no effect as against it. There was judgment for plaintiff as prayed for, and defendants appealed.

### OPINION

Plaintiff's claim against Green is not disputed. The only question, therefore, before the Court is whether the tax sale to Hamner & Company· is valid.

The plaintiff land bank set up various grounds of nullity, among them being that there was fraud and collusion between Green, the tax debtor, and Hamner & Company, his mortgage creditor and the tax purchaser, to let the property sell so that Hamner & Company could buy it in and thereby defeat plaintiff's mortgage claim; and that Hamner & Company stifled bids at the tax sale and "chilled" the

sale so that there was no competition, and further, that Green was insolvent and that the tax sale was no more than a voluntary transfer of his property to Hamner & Company, one of his mortgage creditors, in order to give it an unfair, illegal preference.

We shall discuss these points together.

Hazard Green borrowed $1250 from the plaintiff bank and mortgaged his property to secure the indebtedness. In the act of mortgage to the land bank, Green bound and obligated himself to pay all taxes assessed against the property during the life of the mortgage and agreed that, in case he should fail to do so, the mortgagee might pay such taxes, the amount so paid to become part of the indebtedness secured by the mortgage. Green failed to pay his taxes for 1922. M. S. Wright, a colored man, acting as Secretary of the Gibbsland Colored Farm Loan Association, whose duty it was to look after the payment of taxes on property against which the land bank held mortgages, called on Green to pay the taxes. Green told him that he had not then made arrangements to pay the táxes, but would do so. Later on, Green told Wright that he had paid the taxes and that Wright might so report to the land bank, and Wright made his report accordingly. But the taxes were not paid and the tax collector sold the property to Hamner & Company on June 16, 1923.

The land bank had no knowledge that the taxes were not paid and that the property was sold until 1925, a short time prior to the bringing of this suit. There is no direct, positive evidence that there was collusion between Green, the tax debtor, and Hamner & Company, Ltd., represented by Leslie Hamner, to let the property go to sale for its taxes so that Hamner & Company could buy it in. Neither Green nor Hamner would admit that, of course. But the record is literally loaded with suspicious circumstances which lead irresistibly to the conclusion that Hamner, with Green's consent, manipulated this entire transaction to the advantage of the tax purchaser and to the injury and hurt of the plaintiff land bank. Fraud may be proved by simple presumptions. (C. C. 1848.) What a man intends to do may be inferred from what he does.

Hazard Green is an ignorant, colored man, and in his dealings with Hamner was like clay in the hands of a potter. Leslie Hamner was the dominating head and spirit of Hamner & Company, Ltd., a mercantile corporation, and Green was a customer of that concern and had been for many years. He became indebted to it for $2100 and executed in its favor his note for that amount, secured by a mortgage on this land, which mortgage became second to that of the plaintiff land bank. Green depended upon Hamner for assistance when in need. When M. S. Wright went to Green about the taxes in the spring of 1923, before the sale, Green told him that he would get the money from Hamner, as he did not have it himself. Green testified that he went to Hamner about his taxes for 1922, and that Hamner told him he would take care of "conditions." He was asked, "what conditions?", and he answered, "delinquent taxes." Hamner was asked the direct question whether Green went to him to raise money to pay his taxes, and he answered, "I don't remember." Hamner says he knew that Green's taxes for that year were not paid, and, in view of Green's testimony that he went to Hamner and consulted him about the payment of the taxes and in view of Hamner's failure to deny that, we take it that it is true that

Green did as he said he did. Green testified that Mr. Van Hooser offered to pay his taxes for 1922, and Van Hooser says this is true. The testimony shows that Green would never agree for Van Hooser to pay the taxes. He testified that he knew that Hamner would be at the tax sale and that either he or Mr. Van Hooser would take care of the taxes. Green was asked if he did not know that Mr. Hamner was going to buy the land in at tax sale, and he answered:

"According to conditions, that meant the same."

The question was repeated to him and he said:

"He (referring to Hamner) said he would take care of conditions."

On being asked why he would not agree for Mr. Van Hooser to pay the taxes on his property, he said:

"Why, you might say, according to my circumstances, he (meaning Hamner) has taken care of me off and on, and we was involved in business matters throughout all these years and rather than to have my business scattered, I would rather have him to bought it in on that day, while they are both nice men, but conditions were more favorable in Mr. Leslie (Hamner)."

Green further testified that Mr. Hamner told him repeatedly after the sale that if he would refund the money paid for the taxes, the land would be deeded back to him, and, being asked why he did not redeem his property, he said:

"I'll tell you why—I think I can, because the land was really tied up in the suit and we had to go through a process of law before it would be all right again."

Hamner admits, with rugged candor, that he told Van Hooser prior to the sale that he did not want the taxes paid, but would rather buy the property in. He says also that he told Green that he, or his company, would sell the property back to him for what Green owed on it. Green was not consulted about defending this suit—his answer was filed by Hamner's attorney.

In answer to the charge that he intended by this transaction (which he unquestionably manipulated) to defeat plaintiff's mortgage to the advantage of his company Hamner retorts that he knew nothing of the existence of plaintiff's mortgage until 1925, just prior to the filing of this suit. It is true that at the time Hamner & Company took the mortgage in 1921, a deputy recorder of mortgages made a certificate showing that there were no mortgages on the property; but Green says he told Mr. Hamner that he owed the land bank. The testimony shows that Green was a customer of Hamner & Company when he borrowed from the land bank and that Hamner was familiar with his business—Hamner says so. Green borrowed the money from the land bank to finish paying for his place, and it is unbelievable that Hamner who was at the time not only the head of a large, mercantile corporation, but also vice-president of the bank and thoroughly familiar with conditions in that country, did not know that one of the customers of both the mercantile corporation and the bank was borrowing from the Federal Land Bank. If Hamner & Company had made Green a loan of $2100, as a business venture, it might seem reasonable that Hamner knew nothing of the existence of a prior mortgage on this land. But the mortgage to Hamner & Company was taken to secure past due indebtedness.

As further indicating that Hamner knew of the existence of the mortgage to the

land bank, Hamner & Company by its check paid the installments due by Green to the land bank, in February, 1923, before the tax sale, and in February, 1924. Green says he made arrangements with Hamner, personally, to do that. But Hamner says he knew nothing of his company's having made these payments until just before this case was tried. In view of his connection with the company, this seems to us most strange, to say the least.

Again, Hamner testified that his company bought the property at tax sale to protect itself. The only protection that we can imagine the tax deed afforded Hamner & Company was against the first mortgage of the plaintiff land bank. If, indeed, Hamner & Company held the first mortgage against Green's land, as Hamner says he thought he did, in which Green, joined by his wife, waived the homestead exemption, that mortgage was all the protection it needed. Hamner says he knew he could pay Green's taxes with subrogation and thereby be protected for the amount advanced.

Our conclusion is that Hamner manipulated this tax sale, with Green's concurrence, with intent to shift the title to this property from Green to Hamner & Company, in order to defeat plaintiff's mortgage, and that the tax sale, as between Green and Hamner & Company, amounted to a voluntary transfer of the property.

The testimony shows that Green was insolvent. An insolvent debtor cannot give in payment to one creditor to the prejudice of another, and no distinction is recognized between a voluntary conveyance of property in fraud of creditors and such an alienation disguised under the forms of legal procedure. The fact that the machinery of the law is used to effectuate the fraudulent purpose, aggravates the offense.

H. & C. Newman vs. Baer & Levy, 50 La. Ann. 323, 23 So. 279.

Marx et al. vs. Meyer Bros. et al., 50 La. Ann. 1229, 23 So. 923.

Minge et al. vs. Barbre, 51 La. Ann. 1285, 26 So. 180.

On the other point, we think the testimony amply shows that Hamner, representing the tax purchaser, so interfered that there was in fact no sale of the property as contemplated by law. It was due to his manipulation that the taxes were not paid. Mr. Van Hooser offered to pay them, but Hamner induced him not to do so, and stated as his reasons that he would rather that the property would sell, so that he could buy it in for his company. Van Hooser says that if Hamner had not interfered, there would have been no sale as he would have paid the taxes. He said:

"Yes, I came to pay them, but Mr. Hamner told me that he would rather I wouldn't pay them, that he wanted it to sell."

Hamner admits that. Hamner also prevented Van Hooser, and others, we think, from bidding. Van Hooser was asked if Hamner had requested him not to bid and he said:

"I think that was prior to the sale and I think he asked me not to bid on it, and I left."

Hamner testified that he himself left before the sale took place and that he does not know who bought the property in for his company. He said:

"I have been doing business here for the last two or three years, and I never have known who represented me. I would just let it be known that I was interested in certain pieces of property."

He could have had but one purpose in letting it be known that he was interested

in certain pieces of property, and that was to keep others from bidding on what he wanted.

Courts will not sanction such conduct at tax sales. The purpose of the advertisement is to invite bids and competition. Any interference by a tax purchaser which prevents open, competitive bidding at a tax sale, is a violation of the letter and spirit of the law and will render the sale void.

The land sold was a tract of more than 100 acres, and was worth $15 to $20 an acre. The taxes and costs amounted to less than $40. It is reasonable to assume that others would have paid the amount due for a less portion of the land—if Hamner had not interfered. But Hamner & Company was the only bidder and bought the entire tract in for that amount of the taxes. The result of Hamner's manipulations before the sale was tantamount to an agreement between him and the others that there would be no bidding.

In the case of First National Bank of Abbeville vs. Hebert, 162 La. 703, 111 So. 66, the court said:

"An agreement whereby parties engage not to bid against each other at a public auction, especially where the auction is required or directed by law, as in sales of property under execution, and where one of the parties to the agreement is a party to the proceeding, is a sufficient cause for annulling the sale." (See also authorities cited.)

In S. T. Austin, Jr., vs. Citizens' Bank and Sheriff, 30 La. Ann. 689, Chief Justice Manning, the organ of the court, said:

"But no government will permit its machinery, constructed to enforce the payment of public dues to the fisc, to be used to manipulate a fraud, and if the purchaser is a party to the fraud, he must share its punishment."

(See Babin's Heirs vs. Daspit, 120 La. 755, 45 So. 597; Swain vs. Kirkpatrick Lbr. Co., 143 La. 30, 78 So. 140, 20 A. L. R. 665, and authorities; Haas vs. Haas, 35 La. Ann. 885.)

The judgment of the District Court is correct, and is accordingly affirmed with costs in both courts.