(III So. 66)

No. 27953.

FIRST NAT. BANK OF ABBEVILLE v. HEBERT.

(Nov. 29, 1926. Rehearing Denied Jan. 3, 1927.)

*(Syllabus by Editorial Staff.)*

1. **Homestead** ⊚⟹170—Homestead waiver, stating that it was made under Const. 1898, art. 246, instead of Const. 1913, art. 246, was valid.

Waiver of homestead exemption which stated that it was made under provisions of Const. 1898, art. 246, whereas it should have been made under Const. 1913, art. 246, was valid, since Const. 1898, art. 246, was copied literally in corresponding article of the Constitution of 1913.

2. **Mortgages** ⊚⟹369(3)—Mortgagee's proposal to prospective bidder to stifle competition at foreclosure sale justified setting sale aside, where property sold at one-sixth of its value.

Where president of mortgagee bank proposed to prospective bidder that he should not bid against bank at foreclosure sale until bank had bid certain sum and had quit bidding, and that bank would sell property to him for certain sum, his act had unlawful effect of stifling competition at foreclosure sale and was sufficient cause for setting sale aside, where mortgagor's property sold for about one-sixth of its value.

3. **Execution** ⊚⟹249—Where parties agree not to bid against each other in sale of property under execution, sale may be annulled (Rev. Civ. Code, art. 1847, § 12).

Agreement whereby parties, one of whom is party to proceeding, engaged not to bid against each other at public auction, especially where auction is required by law as in sales of property under execution, is sufficient cause of annulling sale, in view of Rev. Civ. Code, art. 1847, § 12.

4. **Appeal and error** ⊚⟹1180(1)—Refusal to grant preliminary injunction being tantamount to refusing demand for annulment of mortgage foreclosure sale, reversal of judgment was tantamount to allowing demand.

Where, in suit to annul mortgage foreclosure sale, refusal to grant preliminary injunction, after hearing and considering all evidence that was admissible on merits of plaintiff's demand, was tantamount to rejection of demand for annulment of sale, reversal of judgment, after considering evidence on merits, was tantamount to allowance of demand.

Appeal from Fifteenth Judicial District Court, Parish of Vermilion; W. W. Bailey, Judge.

Executory proceeding by First National Bank of Abbeville against Adrien Hebert. Defendant brings suit to annul sale made by sheriff in executory proceeding. From a refusal to issue writ of injunction after trial of a rule to show cause, defendant appeals. Judgment annulled, and case remanded for issuance of writ of injunction and for further proceedings.

L. A. Goudeau, of Lake Charles, for appellant.

Kitchell & Boudreaux, of Abbeville, for appellee.

O'NIELL, C. J. This is an appeal from a refusal of the court to issue a writ of injunction, after trial of a rule to show, under the provisions of the Act 29 of 1924, p. 42. The injunction was asked for as an ancillary proceeding in a suit to annul a sale made by the sheriff in an executory proceeding, the purpose being to prevent execution of a writ of possession by which the sheriff was about to dispossess the defendant in the executory proceeding. The sheriff and the First National Bank of Abbeville, the latter being the plaintiff in the executory proceeding, are the defendants in the injunction suit, or action for nullity of the sale; and Adrien Hebert, defendant in the executory proceeding, is the plaintiff in the injunction suit, or action for nullity of the sale.

[1] Of the several grounds for the injunction, or causes of action set up in the suit to annul the sale, only two are urged in the argument and briefs of the appellant. One of his contentions is that the waiver of his homestead exemption, against the debt due to the bank, was invalid because it was said in the waiver that it was made under the provisions of article 246 of the Constitution of 1898, whereas, the waiver, being dated the 13th of December, 1920, should have been made under the provisions of the Constitution of 1913. No doubt, the reference to article 246 of the Constitution of 1898, instead of the corresponding article of the Constitution of 1913, was an inadvertence, which is a matter of no importance because article 246 of the Constitution of 1898 was copied literally in the corresponding article of the Constitution of 1913, even as to the number of the article, and therefore a homestead waiver, made according to the provisions of article 246 of the Constitution of 1898, is made likewise according to the provisions of article 246 of the Constitution of 1913. There is therefore no merit in appellant's contention that the homestead waiver in favor of the bank was invalid.

The other complaint is serious; that is, that, before the sale, the president of the bank entered into an agreement with a prospective bidder, which stifled competition, suppressed· bidding and caused appellant's property to be sacrificed to the bank for only $1,000, when otherwise it would have sold for at least $6,000.

The mortgage note held by the bank, dated the 13th of December, 1920, was for $3,000, and, with interest accrued to the date of the sale, February 6, 1926, and giving credit for the partial payments acknowledged in the bank's petition, amounted ·to $4,146.60 (according to our calculation), plus 10 per cent. attorney's fees, or a total of $4,561.26. There was also due to the bank, according to

162 La.—23

the sheriff's return, $73.21 for the taxes of 1924, paid by the bank, taking a subrogation, with interest thereon to the date·of the sale. The total amount due to the bank, in preference to all other· creditors of Hebert, amounted to $4,634.47 on the day of sale. The costs of the foreclosure proceedings, together with the taxes for 1925 which the buyer had to pay to the sheriff immediately after the sale, amounted to $138.53, being $73.11 for the costs and $65.42 for the taxes of 1925. The total sum which the property had to sell for to pay the bank's claim in full, on the day of the sale, was therefore $4,773.

The mortgaged property was a farm containing 80.26 acres, and was subject to the homestead exemption to the extent of $2,000. The exemption was waived in the act of mortgage as far as it would otherwise have affected the bank's claim, but was reserved and in force against other creditors of Hebert. There were several judgments recorded against him, constituting judicial mortgages, amounting perhaps to $10,000. He was therefore insolvent, and realized it. At the end of the year 1925, the president of the bank sent for him and told him that the bank would have to foreclose the mortgage. Hebert, who is illiterate and speaks only the French language, says that he got the impression that the bank intended to help him out of his financial difficulties by taking over his farm at a bid which would not exceed the bank's claim, plus his $2,000 homestead exemption, and by allowing him to repurchase the property on terms of credit after being discharged from his other debts in a bankruptcy proceeding. Such an arrangement would have been feasible· and not at all dishonest, because the property was not worth more than the amount 'of the bank's claim, plus Hebert's $2,000 homestead exemption, which would have been valid against other creditors of Hebert in a bankruptcy proceed-

ing or elsewhere. We are convinced by the evidence, however, that the president of the bank did not intentionally do or say anything to make Hebert believe that the bank would resell the property to him if the bank should buy it at the sheriff's sale.

On the day before the day of sale, the president of the bank heard that one Senator Smith, who was a member of a lumber company having a claim for $558, secured by lien on a house on the farm, and who was cashier of a bank holding a judgment against Hebert for $1,832.50, intended to bid on the property; whereupon the president of the bank sent for Hebert and advised him to file a petition claiming the homestead exemption to the extent of $2,000 against all creditors except the bank. Hebert undertook to employ an attorney to file his claim, but, being unable to pay a fee for the service, went to one of the attorneys representing the bank in the foreclosure proceeding and persuaded him to file the claim, which the attorney did reluctantly because of his representing the bank, and merely as a matter of kindness to Hebert and without charging a fee.

On the morning of the sale, and before the sale—or perhaps on the day before the sale—one Laurent Dartez called at the bank and informed the president that he, Dartez, was anxious to buy the property and would bid as high as $6,000 at the sheriff's sale. The president of the bank then told Dartez that the bank's claim amounted to $4,800 or $4,900, and that the bank would protect its claim by bidding the amount of it if necessary; that he, Dartez, should be present at the sale and bid on the property when the bank quit bidding; and that, if the bank should be the successful bidder, the bank would sell the property to him for $6,000. The president of the bank then also offered to loan Dartez money if he needed it to bid on the property after the bank had bid the amount of its claim and quit bidding. He was present at the sale, but

did not bid. The bank bid $1,000 and got the property at that price. The bank paid the sheriff $73.11 in full payment of the costs of the foreclosure proceedings and the $65.42 due for taxes for 1925, and retained $73.21 for the taxes of 1924 and $788.26 in part satisfaction of the bank's mortgage, leaving a balance due on the bank's mortgage, approximately $3,773. Three days afterwards the bank sold the property to Dartez for $6,000 on terms of credit.

[2] We have no doubt that the president of the bank did not realize that the effect of his proposal to Dartez not to bid against the bank, until the bank had bid approximately $4,900 and had quit bidding, would be to lessen competition and suppress bidding, to the prejudice of Hebert. The bank president's proposal to Dartez, none the less, being accepted and acted upon by Dartez, had the unlawful effect of stifling competition and of sacrificing Hebert's property for only a sixth of its value, to the advantage of the bank. If the president of the bank had let Hebert know that Dartez was willing and ready to bid $6,000 for the property, it is very likely that Hebert could have arranged to run up the bidding nearly that high, and could thus have paid his mortgage debt to the bank and collected about $1,227 on his homestead claim. Even though Hebert might not have been able to protect his homestead claim, the bank's arrangement with Dartez left Hebert in debt to the bank for $3,773 which he would not owe but for the bank's arrangement with Dartez. To that extent, at least, he was injured by the bank's persuading Dartez not to bid. Hebert testified that the reason why he did not attend the sale or make any effort to protect his homestead claim was that the president of the bank requested him to remain on the farm and take care of it. We do not believe that the president of the bank did or said anything to induce Hebert to remain away from the sher-

iff's sale or refrain from protecting his homestead claim. We do believe, though, that the reason why Hebert made no effort to protect himself with the aid of his homestead exemption, when, if he had been apprised of the true situation, it would have been so easy for him to protect himself to some extent against the great sacrifice which he suffered, was that, through some misunderstanding, he relied upon the bank to bid enough to protect both the bank's and his claim. And, considering that he and the bank president were dealing with each other not at arm's length, but with some confidence in each other, our opinion is that the bank president should not have made the arrangement with Dartez—particularly without informing Hebert and giving him some opportunity to protect himself against the disastrous consequence of the arrangement between the bank and Dartez.

[3] An agreement whereby parties engage not to bid against each other at a public auction, especially where the auction is required or directed by law, as in sales of property under execution, and where one of the parties to the agreement is a party to the proceeding, is a sufficient cause for annulling the sale. Rev. Civ. Code, art. 1847, § 12; Merchants' Insurance Co. v. Addison, 9 Rob. 486; Chaffe v. Farmer, 34 La. Ann. 1017; Swain v. Kirkpatrick Lumber Co.. 143 La. 30, 78 So. 140, 20 A. L. R. 665. quoting from 2 R. C. L. 1131, § 16; 6 C. J. 830, 831, §§ 31, 32.

[4] The appeal taken in this case was, of course. only a devolutive appeal. Because of the circuitous and anomalous practice that is required by the Act 29 of 1924—allowing evidence to be heard on the trial of a rule to show cause why a preliminary injunction should not issue—this case has been virtually tried and disposed of on its merits, although, ostensibly, all that was tried or decided was the rule to show cause why the preliminary injunction should not issue. The refusal of

the district judge to grant a preliminary injunction, after hearing and considering all of the evidence that was admissible on the merits of the plaintiff's demand, was tantamount to a rejection of the demand for annullment of the sale; and our reversal of the judgment, after considering all of the evidence on the merits of the case, will be tantamount to an allowance of the demand for annulment of the sale. The courts cannot help that, and obey the statute. If the bank has taken possession of the property, a preliminary injunction will serve no purpose; and we doubt that the plaintiff will want a preliminary injunction since the case has been virtually tried and decided on its merits. He is entitled to the writ, if it is not too late, and to a formal trial and decision of his action for nullity on its merits.

The judgment appealed from is annulled and the case is ordered remanded to the district court for the issuance of a writ of injunction, on the plaintiff's furnishing a proper bond for such sum as the judge shall fix, and for further proceedings consistent with the foregoing opinion. The defendant, bank, is to pay the costs of the trial of the rule to show cause why the injunction should not issue, including the costs of this appeal. All future costs of this suit are to depend upon the final judgment.