ST. PAUL, J.
 

 This is the third chapter of this litigation, the two former chapters thereof having been written under the same title in 162 La. 703, 111 So. 66, and 163 La. 378, 111 So. 792.
 

 I.
 

 In the second opinion herein handed down (163 La. 378, 111 So. 792) we stated the gist of the controversy as follows:
 

 
 *130
 
 “(I) Relator’s (defendant’s) property was seized by the sheriff, and sold under executory process (foreclosure proceedings). The property was bid in by the bank, and sold by it to one Dartez. When the bank and Dartez attempted to take possession of the property, relator filed a suit to annul the
 
 sale
 
 on the ground that the bank and Dartez had (in contemplation of law) colluded to suppress bidding-at the sheriff’s sale, and he prayed that the sheriff be enjoined from executing the writ of possession issued against him. A preliminary injunction was refused by the court below, whereupon relator took a devolutive appeal. On that appeal the judgment of the lower court refusing a preliminary injunction was reversed, and our decree was that such an injunction should issue. * * * [See 162 La. 703, 111 South 66.]
 

 “(II) It now develops that, pending that devolutive appeal, the writ of possession was lawfully executed, and Dartez put in possession of the property. * * *
 

 “(V) It is clear, therefore, that what he (defendant) is now seeking is' primarily [i. e. in effect] a
 
 mandatory
 
 injunction to restore a condition existing when he applied for the prohibitory injunction which was refused by the court below, and which condition has been
 
 lawfully
 
 changed in the meanwhile. * * *
 

 “(VI) * * * We therefore conclude that the trial judge properly refused to issue the mandatory injunction prayed for before a full and final hearing on the merits.”
 

 The concluding paragraph of the first opinion herein handed down is as follows:
 

 “* * * Because of the circuitous and anomalous practice that is required by the Act 29 of 1924 — allowing evidence to ■ be heard on the trial of a rule to show cause why a preliminary injunction should not issue — this ease has been virtually tried and disposed of on its merits, although, ostensibly, all that was tried or decided was the rule to show cause why the preliminary injunction should not issue. * * * He (defendant) is entitled to * * * a formal trial and decision of his action for nullity on its merits.”
 

 II.
 

 The concluding paragraph of both opinions shows very clearly that the first opinion herein handed down is not res judicata as to the right of defendant (plaintiff in injunction and in the action of nullity) to a permanent injunction on the merits, or to have the sheriff’s sale annulled. Hence his plea of res judicata, filed in this court, is not well founded. A judgment granting or refusing a preliminary injunction is not a final judgment on the merits of the case, and therefore cannot be pleaded as res judicata when the merits are involved. Cf. Act 29 of 1924.
 

 .III.
 

 This case is now before us on appeal from a judgment rejecting, on the merits, defendant’s action to annul the sheriffs sale. And as stated in plaintiff’s brief, “The sole question for decision by the court in this case is, Did or did not the First National Bank of Abbeville prevent Laurent Dartez from bidding on the property involved here) -at 'the judicial sale of the same by ■ the Sheriff of Vermillion Parish on the 6th day -of February 1926?”
 

 IV.
 

 On the trial of the rule for a preliminary injunction, Adrien Hebert, the defendant, testified that, after the sale, he went to' see Mr. Nelson Greene, the president of the bank, relative to reacquiring the property pursuant to an alleged (but denied and disproved) agreement to let him have the property back on terms; that at that time the president told him that he could not let him have the property, as he had sold the property to Leon Dartez for $6,000 pursuant to an agreement entered into before the sale, whereby he had
 
 *132
 
 agreed that, if Dartez would not bid against the bank, the bank would let him have the property for $6,000, if it became the adjudicatee thereof.
 

 His son, Theo^has Hebert, corroborated his father’s testimony.
 

 One Ovey Trahan, who was present at that conversation, testified in a rambling sort of manner that Greene had declared that he had “told Laurent (Dartez) that he should not do that” i. e., bid against the bank; that “he said [to Dartez] he would bid his amount, but he did not name the amount, and if he [Dartez] wanted the property to go on with his bidding.”
 

 ■ Nelson Greene, the president of the bank, testified that he had made no such statement as Hebert claimed, nor had any such agreement with Dartez before the sale; that Dartez had come to him before the sale to look into the feasibility of purchasing the property ; that he had told him the bank would assist him if he desired to purchase; that he could not purchase for less than the amount of the bank’s claim (about $4,900), as the bank intended to protect itself by bidding the amount Of that claim; but that he (Dartez) should go to the sale if he wanted the property, as Senator Smith, who represented some $2,000 or more of claims against Hebert, would probably be a bidder; and that he (Dartez) should continue to bid against Smith after the bank had ceased bidding.
 

 Mr. Le Blanc, cashier of the bank, who was present at both conversations, that between Greene and Hebert and that between Greene and Dartez, corroborated the testi; mony of Greene as to what was said at both of them.
 

 Mr. Laurent Dartez, though present in court when the rule was tried, to the knowledge of both sides, was not called by either side, and did not testify.
 

 Y.
 

 On the trials of the merits, defendant re< offered all the- testimony taken on his behalf on the trial of the rule, to wit, the testimony of himself, his son, and Ovey Trahan.
 

 Plaintiff also offered the testimony taken on its behalf, to wit, of Greene and Le Blanc;' and it also called several other witnesses, whose testimony, however, throws no appreciable light on the question before us.
 

 Plaintiff also recalled Greene and Le Blanc, and their testimony given this second time is substantially the same as that first given by them.
 

 VI.
 

 Plaintiff also called Dartez, who had not testified before. We quote his testimony in full, as follows:
 

 “Testimony of Laurent Dartez — Marked A.
 

 “Laurent Dartez being first duly sworn on behalf of the plaintiff bank deposes and says on March 29, 1927.
 

 “Questioned in chief by J. R. Kitchell, Esq.:
 

 “Q. Mr. Dartez, you were summoned as a witness in this case when we tried the rule for the injunction?
 

 “A. Yes, sir.
 

 “Q. Who summoned you?
 

 “A. Mr. Adrian Hebert.
 

 “Q. Mr. Hebert?
 

 “A. Yes, sir.
 

 “Q. Did his attorney call you to the Stand?
 

 “The above and foregoing question is objected to by Counsel for Adrian Hebert on the ground that the record shows and it is admitted by Counsel for both sides at the time the rule for the injunction was tried Mr. Dartez was in court, summoned as a witness, and, that he was not called by either the plaintiff nor the defendant — objection overruled by the Court — to which- ruling of the court, counsel for Deft, excepts, reserv
 
 *134
 
 ed the point and tenders this note to stand in lieu of a bill.
 

 “A. No.
 

 “Q. You were in court until the case ended that day. — were you not?
 

 “A. Yes, sir.
 

 “Q. Hr. Dartez, did you have any conversation with Mr. J. Nelson Greene, President of the First National Bank of Abbeville, concerning this property in question which was sold at Sheriff’s sale and bought in by the bank?
 

 “Counsel for Deft. Adrian Hebert, objects to the above and foregoing question on the ground that — Counsel objects to the testimony sought to be elicited herein because the party testifying under oath is more than a mere witness — he is actually seeking the intervention of judicial power in his behalf and the party having shown the facts should not be permitted to swear to facts primarily unsworn to or to show facts controverted by other sworn testimony — objection overruled by the court to which ruling of the Court, Counsel for Deft. Hebert, excepts, reserves the point and tenders this note to stand in lieu of a bill, and, by consent of Court and Counsel this objection is made general to cover ail similar testimony from this or any other witness — same ruling and same bill reserved.
 

 “Q. How many conversations do you recall that you had, Mr. Dartez?
 

 “A. One.
 

 “Q. Where did that conversation take place, Mr. Dartez?
 

 “A. At the bank.
 

 “Q. Will you please state to the Court what you said to Mr. Greene in that conversation and what Mr. Greene said to you — give all of the particulars and give the conversation in detail as much as you can?
 

 “A. Well, I went to see Mr. Greene to find out where the place would be sold as I intended to buy it, and, I found that I did not have the funds to.pay for. same, and,-that is the reason why I went to see Mr. Greene, to see if I could borrow the .money to pay for - it, and, Mr. Greene, when I asked him about it, told me yes, it is going, to bq sold and he said, if you want to buy.it I will.give you the money, and, he told me it was going to be sold and to be sure to be there because he thought Mr. Smith intended buying the place. Well, I said, that is all right, I just wanted to find out if I cquld get the money, and, I asked him how much mortgage the bank held against the property and he told me around $4,800.00 or $4,900.00. I turned around and came here. to the court house and the Deputy was preparing the paper» and I told him that I intended to buy the property and he told me all right, and, I told! him at the sale to pay attention to me, X said, I am a little nervous at every thing but when you are selling if you pay attention to me I will raise my hand and when I do you can raise the bid $25.00. Well during the time they were reading the mortgage and the judgment that they had against him I made up my mind I would not borrow the money to buy the place because I might be put in trouble, there would be so much money payable in one year, that it would be hard for anybody who would buy the place, and, I thought probably it would be the First National Bank or Mr. Smith would buy — when I thought I would buy I did so because I thought I could buy it at a reasonable price —with terms.
 

 “Q. To what Deputy did you speak?
 

 “A. To Mr. Delcambre, the big one — the one that sold the place.
 

 “Q. Did you mention any thing at that time to Mr. Greene that if the bank happened to get the property would the property be for sale?
 

 “The above and foregoing question is objected to by Counsel for Deft, on the ground that it is leading and suggestive.
 

 
 *136
 
 “Q. Was anything else said in this conversation? *
 

 “A. I asked him if he bought the property ' would they sell it — if the bank bought the property would it be for sale, and, Mr. Greene answered, yes, that the bank had enough property — it was money they wanted to bring in.
 

 “Q. Now, Mr. Dartez, it is charged in the petition of Mr. Adrian Hebert, that you 'and ' Mr. Greene agreed that if you would not bid against the bank — the First National Bank of Abbeville, why then if the bank got the property they would sell it to you for $6,000 and that is the reason why you did not bid at the Sheriff’s sale — what have you to say about that?
 

 • “Counsel for Defendant, Mr. Adrian Hebert, objects to the above and foregoing question on the same grounds previously urged, that it is an attempt to contradict and impeach the testimony given by Mr. Greene at the time of the trial of the Rule — objection overruled by the Court — Bill reserved.
 

 “A. No, sir, there was nothing agreed — the reason I went to see Mi\ Greene was that I did not have the money to bid in for the property, if that had not been the cause I would not have gone to see Mr. Greene.
 

 “Q. You are positive that no such agreement was ever had between you and Mr. Greene, I understand that to be what you say, Mr. Dartez?
 

 “A. No, sir, there was no such agreement between us.
 

 “Q. I understand that when you went to the Sheriff’s sale you expected to bid against the First National Bank or any one else.
 

 . “The above and foregoing question is objected to as leading.
 

 “A. Oh, yes, sir.
 

 “Q. I understand from your foregoing testimony that you changed your mind for the reasons stated and concluded not to bid before the Sheriff had actually offered the property for sale or had actually cried the sale?
 

 “Same objection — samé ruling and same bill reserved.
 

 “A. I don’t quite understand that.
 

 “Q. Mr. Dartez, I understood you to say that you changed your mind about buying the property for the reasons you have already given while the Sheriff was reading the mortgage certificates and judgments?
 

 “A. Yes, sir, that is why I changed my mind — he read them for about a half an hour.
 

 “Q. If I understand your testimony correctly, you changed your mind and concluded not to buy the property and that one of the reasons was you did not want to borrow money on a year’s time; that you thought it best for your own interest to take a chance and buy the property from some one .who had bought it at the sheriff’s sale on your own terms, if you could?
 

 “The above and foregoing question is objected to by Counsel for Defendant on the ground it is leading and suggestive of the answer — the witness has already testified to that effect and it is useless to repeat it- — it only serving to.encumber the record.
 

 “A. Yes, sir, I had already gone to see my brother who always signs all of my notes and he was not at home, and, while Mr. Deleambre was reading the certificate of mortgage I thought of buying the property for three years’ time at 6% — I was afraid to buy — I thought that Mr. Smith who was supposed' to buy or Mr. Greene would buy I would then make the offer to them of buying on three years’ time paying six percent for the money, I was afraid to buy also .because I thought $6,000 was more than I could afford to pay in a year’s time.
 

 “Q. Well, after the bank bought the property at the Sheriff’s sale did you go then and offer to buy the property from the bank?
 

 “A. Yes, sir, I went to Mr. Greene and I
 
 *138
 
 said, you bought the property will you not sell it to me, and he said, well, I don’t know — I suppose so, and I said, if you want I will give you $6,000 for it — three years’ time at 6% and he told me, no, I don’t believe can do it — we lend money at 8% — I went back home and talked about this to my wife and asked her if she was willing for me to pay $6,000 for the place and she said yes, and on Monday, I came back here and went to the Bank and asked the same question to Mr. Greene and he told me — I cannot possibly do that unless, the Board authorizes me to do so and so they met. * * *
 

 “Q. Were you there?
 

 “A. Yes, sir, they met and I went in the room with them, there was Mr. McPherson, Mr. J. G. Be Blanc and Mr. Greene and they asked $1,000 cash, I wanted to buy the same on credit and they asked $1,000 cash — I told them I could pay them $500.00 but no more, and, they agreed to sell it to me under those conditions.
 

 “Q. Did I understand you correctly, Mr. Dartez, in your saying the first proposition to Mr. Greene was to buy on credit and pay $6,000 — three years’ time at 6% and Mr. Greene turned that proposition down?
 

 “Objected to by Counsel for Deft, on the ground it is a mere repetition.
 

 “A. Yes, sir, making the notes on or before ; that was after it had been sold here.
 

 “Q. Now, I understand that the bank then made an offer to sell for $6,000, but they stipulated a cash payment of $1,000, a proposition which you (Mr. Dartez) turned down?
 

 “A. Yes, sir, I refused.
 

 “Q. Then, you finally agreed upon the terms of a sale?
 

 “A. Yes, sir, three years and 6% interest — payable on or before and $500.00 cash.
 

 “Q. Mr. Dartez, you stayed at the sale until it was completed — until the bank bought the property?
 

 “A. When I left Judge Greene at the bank I came straight to the Sheriff’s office and when Delcambre went out to sell the property I went out with him and I stayed there until it was sold.
 

 “Q. Did you see Mr. Joe Greene there?
 

 “A. Yes, sir, Mr. Joe Greene was there and bought it.
 

 “Q. Did you talk to Mr. Joe Greene before you talked with Delcambre about the property?
 

 “A. No, sir, I did not talk to Mr. Joe before or after the sale.
 

 “Q. After you talked with Delcambre you did not talk to any of the officers of the bank before they bought the property?
 

 “A. No, sir, I stayed in the office with Delcambre.”
 

 VII.
 

 Upon the testimony taken on the rule to show we thought there was sufficient showing made to authorize the issuance of a preliminary injunction.
 

 When we come to consider the merits we do not think that testimony, in the light or that given by Dartez, and quoted in full above, is sufficient to warrant us in concluding that there was any agreement between Greene and Dartez that the latter was not to bid against the hank and that the bank was to buy in the property and sell it to him for a fixed price.
 

 The trial' judge was of that opinion, and we think his judgment is correct. Cf. Schlater v. Brusle, 49 La. Ann. 1704, 22 So. 925.
 

 Decree.
 

 The judgment appealed from is therefore affirmed.