12 So.2d 684

**PEASE et al. v. GATTI.**
No. 36389.

Nov. 30, 1942.

Rehearing Denied March 8, 1943.

C. B. Prothro, of Shreveport, for appellant.

J. Bennett Johnston and Albert P. Garland, both of Shreveport, for appellees.

ODOM, Justice.

G. Frank Pease borrowed $10,000 from the Federal Land Bank of New Orleans on June 12, 1922, and to secure the loan executed a mortgage in favor of the Land Bank on 1,118 acres of land in Bossier Parish. The loan was payable in annual installments of $700, the installments being represented by notes payable on November 15 of each year beginning with the year 1923. He paid his installments regularly until November 15, 1927, when he defaulted. He subsequently paid the note due on November 15, 1927, the payment being made in installments. He was unable to pay the note of $700 due on November 15, 1928. In order to obtain funds with which to pay that note, he borrowed $700 from the Shreveport National Farm Loan Association, which association had endorsed his Land Bank notes. One year later he executed a second mortgage on his property in favor of the Farm Loan Association, which had advanced to him the money with which to pay the installment which fell due on November 15, 1928. The loan of $700 made to him by the Farm Loan Association was represented by one note conditioned to bear interest at the rate of 8 per cent per annum from maturity and 10 per cent attorney's fees.

It appears that Pease defaulted on his note due the Federal Land Bank on No-

vember 15, 1929, and that he subsequently paid the Land Bank with the assistance of the Farm Loan Association. He defaulted again on his note due the Land Bank on November 15, 1930, this installment also being paid through the assistance of the Farm Loan Association. The record does not make clear the exact amount advanced to Pease by the Farm Loan Association to enable him to make the latter two payments to the Federal Land Bank. However, it is clear that by May 26, 1931, Pease owed the Farm Loan Association some amount exceeding the amount of the mortgage which he had executed in its favor on November 15, 1929.

On May 26, 1931, the Shreveport National Farm Loan Association instituted foreclosure proceedings on its note of $700 secured by second mortgage, as aforesaid, and the mortgaged property belonging to Pease was advertised to be sold by the sheriff on July 25, 1931. The foreclosure proceeding was brought in the name of Hal M. Gatti, who was secretary and treasurer of the Shreveport National Farm Loan Association, of which association G. Frank Pease, the debtor, was a member and the owner of stock amounting to $500.

After the advertisement appeared in the Bossier Banner, a newspaper published in the Parish of Bossier, and before the sale took place, the following agreement was entered into by and between Hal M. Gatti, representing himself and as agent for the Shreveport National Farm Loan Association, and I. F. Cryer:

"Agreement

"This agreement entered into this 3rd day of June, 1931, by Hal M. Gatti, acting for himself and as agent for the Shreveport National Farm Loan Association hereinafter known as parties of the first part, and I. F. Cryer, hereinafter known as the party of the second part.

"The parties of the first part agree to bid in at Sheriff sale, not to exceed Ten Dollars ($10) per acre, a tract of land now in litigation under Suit No. 11223 involving 1118 acres of land in Bossier Parish more particularly described as: All of Section 25, Township 19, Range 12, the North Half and the Southeast Quarter of Section 26, Township 19, Range 12 and to resell same to party of the second part, for the sum of Ten Dollars ($10) an acre on terms as follows: a certain Three Thousand Dollar ($3000) first mortgage note owned by party of the second part and given by Pat Rennick to secure the unpaid purchase price of a certain tract of land in Simms Subdivision, Bossier Parish, Louisiana, as cash payment and the assumption of a Six Thousand Eight Hundred Thirty-Seven and 50/100 ($6837.50) mortgage being the unpaid balance of a certain Ten Thousand Dollar ($10000) mortgage note due the Federal Land Bank on mortgage as of November 15, 1930, and to give a second mortgage for One Thousand Three Hundred Forty-two and 50/100 ($1342.50) due in five (5) equal annual installments with 8% per annum interest payable annually from date of conveyance.

"The party of the second part agrees to

purchase and accept the above described land on the above conditions and price and terms stipulated at such time as he may be called upon by parties of the first part to accept same after litigation and Sheriff sale of said property now in litigation.

"This done and signed this 3rd day of June, 1931.

"Witness: Hal M. Gatti
"Muriel R. Ingram Shreveport National
"J. M. Flenniken Farm Loan Asso.
By Hal M. Gatti,
Secty Treas.
I. F. Cryer"

As copied in the transcript, this agreement bears the date of June 3, 1931. But this date is evidently erroneous, for the reason that the advertisement did not appear in the newspaper until some time after that date, and the evidence shows that the agreement was entered into after the advertisement appeared in the local newspaper. According to this agreement, Hal M. Gatti was to bid in the property at the sheriff's sale and was to resell it to I. F. Cryer at the stipulated price of $10 per acre, or the gross sum of $11,180. But subsequently, and before the sale took place, it was agreed between Gatti and Cryer that, instead of Gatti's purchasing the property at foreclosure sale and reselling it to Cryer, Cryer himself should purchase the property in his own name. There is some testimony in the record which indicates that this was done on the advice of counsel in order to save the expense of an additional transfer.

Cryer was the last and highest bidder for the property, and it was sold to him, and, according to the sheriff's returns and his procès verbal of the sale, Cryer bid the sum of $7,250 for the property. The sheriff's costs amounted to $51.25, clerk's costs to $11.15, publisher's costs to $7, cost of deed to $2, and cancellation of mortgages to $2, or a total amount of $73.40, leaving a balance of $7,176.60. Of this amount, the purchaser retained in his hands the sum of $7,059.76, the amount due the Federal Land Bank on its first mortgage. This left a balance of $116.84, which amount, according to the returns, the sheriff paid to Hal M. Gatti; so that G. Frank Pease, the debtor, received, or should have received, a credit on the second mortgage, due the Shreveport National Farm Loan Association, of only $116.84.

The sheriff's procès verbal of the sale is dated July 25, 1931. Thereafter, and on the same day, I. F. Cryer, the purchaser of the property at sheriff's sale, executed a second mortgage on the property purchased in favor of the Shreveport National Farm Loan Association for the sum of $1,342.50, this amount being represented by five notes each for the sum of $268.50, which notes were delivered to the Farm Loan Association, the mortgagee. At the same time, Cryer delivered to Hal M. Gatti personally a promissory note for $3,000 which Cryer owned and which was secured by a first mortgage on Lot 5 and 20 feet off the east side of Lot 6 in the Simms Subdivision in Bossier Parish, Louisiana, which note and the mortgage securing it were executed by P. T. Rennick. All this was done in accordance with the written agreement between Gatti and Cryer entered into prior

to the sale, which written agreement we have copied in full above.

G. Frank Pease died on January 6, 1937. The present suit was filed by his widow and three children against Hal M. Gatti. They alleged that Gatti is indebted unto them in the sum of $3,000, and they prayed for judgment against him in that amount.

Their petition is quite lengthy and very involved. It contains 39 separate and distinct articles, and gives a detailed recital of the facts hereinabove stated. Their complaint, in sum, is that, through and by virtue of an unlawful scheme and device concocted and carried out by the defendant Gatti, he so manipulated the foreclosure sale as to enrich himself to the extent of $3,000, to the injury, hurt, damage, and detriment of G. Frank Pease, the mortgage debtor, and that, through such unlawful manipulations and profits to himself, he became indebted to G. Frank Pease in that sum, and that as a result he is now indebted to petitioners. They alleged that I. F. Cryer, the purchaser of the property at sheriff's sale, paid therefor the sum of $3,000 more than was necessary to pay the indebtedness to the Federal Land Bank and the amount due the Shreveport National Farm Loan Association, which association was represented in the foreclosure proceedings by the said Hal M. Gatti; that this excess payment by Cryer, the purchaser, should and would have inured to the benefit of G. Frank Pease, the mortgage debtor, had it not been for the unlawful scheme and device concocted by the defendant Gatti.

They alleged that the Shreveport National Farm Loan Association, of which G. Frank Pease was a member, was organized and maintained for the mutual aid and benefit of its members, who were indebted to the Federal Land Bank of New Orleans; that the Farm Loan Association endorsed, and became responsible for the payment of, the notes due by the said Pease to the Federal Land Bank, as well as the notes due the bank by other members of the association; that the said Hal M. Gatti was the agent and representative of the Federal Land Bank and was the secretary and treasurer of the Farm Loan Association, and that he was familiar with the rules and regulations governing the Farm Loan Association, and was familiar with the duties and obligations which that association assumed toward its members. They further alleged that, due to the peculiar relationship which existed between the Farm Loan Association and its members, it was the duty of Hal M. Gatti, who was authorized by the association to file the foreclosure proceeding, to protect the interest of Pease as well as the interest of the association; that the said Gatti was the agent not only of the association, the lender, but of Pease, the borrower, and that it was the duty of Gatti to see that Pease received credit for the total amount paid for the property by Cryer, the purchaser. They further alleged that the fiduciary relationship which existed between the Farm Loan Association, represented by Gatti, and Pease, the borrower and a member thereof, arose out of the fact that the association was or-

ganized for the mutual benefit and protection of its members.

Hal M. Gatti's defense is that Pease, the mortgagor, was present at the sale and did not bid; that the sale was made at public auction, and that the only bidder was I. F. Cryer, to whom the property was adjudicated; that there was no stifling or chilling of bids, and that the sale was regular in form and legal in all respects; that Pease was indebted to him personally as well as to the foreclosing creditor, and that in entering into the agreement with Cryer he was representing himself as well as the Farm Loan Association. His contention is that the transaction was legitimate throughout. A further contention made by the defendant is that the note for $3,000, which was given to him by Cryer, was not in fact worth anything like its face value at that time, nor was it ever worth more than $1,-000, and that he did not and has not, as a matter of fact, profited by the deal, because it became necessary for him to pay personally certain expenses connected with the sale.

The district judge did not assign written reasons for his judgment. But he was evidently of the opinion that the defendant had unlawfully obtained the $3,000 note. This is indicated by the judgment which he rendered, which is as follows:

"It is ordered, adjudged and decreed that the defendant Hal M. Gatti, be and he is hereby ordered and condemned to render to the plaintiffs * * * within ten (10) days from this date an accounting in connection with the Three Thousand and no/100 ($3000.00) dollar mortgage note executed by P. T. Rennick and received by Hal M. Gatti from I. F. Cryer, in connection with the foreclosure sale entitled Hal M. Gatti vs. Frank G. Pease, No. 11,223, Twenty-Sixth Judicial District Court, Bossier Parish, Louisiana."

From this judgment the defendant appealed. The plaintiffs answered the appeal, alleging that they were entitled to an unconditional judgment for $3,000, and prayed that this court render judgment in their favor for that amount.

We have already stated the relevant facts and issues involved in this litigation. The testimony adduced at the trial sustains plaintiffs' allegations of fact in practically every detail. The testimony of the defendant Gatti and others shows that in 1922, when G. Frank Pease borrowed $10,000 from the Federal Land Bank of New Orleans, other property owners in the vicinity were indebted to that bank. These borrowers from the Land Bank, including Pease, were all members of the Shreveport National Farm Loan Association.

A. J. Scott testified that he was a farmer and was the president and one of the directors of the association. He was asked to state the purpose of the association, and he said, "It was organized for the benefit of the farmers." He said the members borrowed from the association and that the purpose of the association was to help its members "along in their dealings with the Federal Land Bank". He testified that it was against the policy and purposes of the association for it or any of its officers to secure any personal advantage or benefit in foreclosure sales against its members.

Mr. I. T. Nelson testified that he was a member and one of the directors of the association. He said that the object and purpose of the association was to aid and assist its members who were in distress financially.

The defendant Gatti testified that, in cases where the Federal Land Bank made a loan to a member of the association, the association was obligated to service the loan; that it endorsed the notes due by the members to the Land Bank, and it was obligated to pay the loan if the borrower defaulted. He was asked, "When a borrower defaults on his land bank installment then the association has to pay it?" And he said, "That is correct." Mr. Scott and Mr. Nelson testified that they had never heard that the association or any member or officer thereof had attempted to take advantage of one of its members who was in distress. They said, in effect, that the purpose of the association was to help, and not to hurt, its members. According to their testimony, it was the duty of the association to look after and protect the interest of its distressed members.

G. Frank Pease was a member of the association. When he found himself unable to meet his payments to the Federal Land Bank, he went to the association for assistance, and received it. The association loaned him $700 at one time and took a second mortgage on his property to secure the loan. This was the mortgage which was foreclosed by the association with Gatti as its representative in the foreclosure proceeding. The association advanced Pease other sums on other occa-sions. Some of these advances were paid by him and some were not. The association also paid his taxes for the years 1930 and 1931; so that, at the time the foreclosure proceedings were instituted, Pease owed the association a sum in excess of the amount of the mortgage. Gatti testified that the total amount due by Pease to the association was $1,619.50. The judge asked him whether that included the $700 mortgage which was foreclosed, and he said it did.

The defendant Gatti was secretary and treasurer of the Farm Loan Association, and seems to have represented it generally. He was familiar with its books and knew the financial standing of its members. He testified that the Board of Directors of the association adopted a resolution authorizing him to institute foreclosure proceedings against Pease in his name, for, and on behalf of, the association. He said he did not own the note, but that the note was owned by the association. He said also that he knew that Pease was in financial distress; that Pease told him on the morning of the day on which the sale was to take place "that he had tried every way in the world he could to meet those obligations. He could not do anything with the place, he could not get anyone to take up the indebtedness against him or pay those installments for him".

Gatti knew that it was the policy and duty of the association to help its distressed members, and knew that Pease was in distress because Pease had told him so. He knew that Pease could not protect his interest at the sale, for no one would help

him. On the day of the sale and for some time prior thereto, Gatti knew the exact amount Pease owed the association which he represented, and knew how much he owed the Federal Land Bank. He testified that the only interest he had in the sale was to make the property bring the amount of the indebtedness.

Gatti knew, of course, that it was the duty of the association, and his duty as its representative, to help Pease if he could. And yet, on the day of the sale and for some time prior thereto, he was in possession of information which he withheld from Pease and which, if it had been imparted to Pease, might have enabled Pease to save his property. Gatti knew that I. F. Cryer was willing to pay $10 per acre for the land, or a total of $11,180, which was $3,000 in excess of the amounts which Pease owed the Federal Land Bank and the Farm Loan Association. Instead of imparting this information to Pease, as he should have done, Gatti entered into a private or side agreement with Cryer prior to the date of the sale, under which agreement Gatti was to bid in the property at a price not exceeding $10 per acre and to resell it to Cryer at the same price. The tract of land contained 1,118 acres, so that the price which Cryer was willing to pay for the land was $11,180. This amount was to be paid by Cryer as follows: He was to deliver to Gatti a $3,000 first mortgage note which he owned, the note being secured by a first mortgage on a certain tract of land in the Simms Subdivision of Bossier Parish, and was to assume the balance due by Pease to the Federal Land Bank, amount-

ing, according to the recitals of the written agreement, to $6,837.50, and to execute a second mortgage on the property to be purchased in favor of the Farm Loan Association for $1,342.50, these sums aggregating $11,180, which was exactly $3,000 more than Pease owed the Federal Land Bank and the Farm Loan Association. It therefore clearly appears that, according to Gatti's own figures, Pease had an equity in the property amounting to $3,000.

After the agreement was signed and before the day on which the property was sold, it was agreed between Gatti and Cryer, the prospective purchaser, that Cryer himself should bid in the property, which he did, and the property was adjudicated to him by the sheriff for $7,250. He retained in his hands an amount sufficient to pay the first mortgage in favor of the Federal Land Bank, and on the same day delivered to Gatti the $3,000 note and executed a second mortgage on the property in favor of the Farm Loan Association for $1,342.50. Thus it appears that Gatti, by entering into the private or side agreement with Cryer, enriched himself at the expense of Pease to the extent of $3,000, or at least to the extent of the value of the $3,000 note.

Now, the question is whether Gatti's manipulation of the sale was such as to render him liable or bound to account to Pease for the profit he made on the sale. If under the law, he was bound to render an accounting to Pease, he is now bound to render an accounting to plaintiffs as the widow and heirs of Pease, because whatever action Pease had against Gatti survived in favor of plaintiffs. Pease died in

1937 without knowledge of the circumstances connected with the sale, nor did his widow and children know of the circumstances until September 1, 1939. The suit was filed on August 31, 1940.

Gatti is liable. His own testimony convicts him. He was not a third party, but a party interested in the foreclosure proceeding. He instituted the proceeding in his own name, but he says he did not own the mortgage foreclosed and that he acted as agent for, and on behalf of, the Farm Loan Association, which did own it.

He owed to Pease the duty and obligation of imparting to him the information that Cryer would be present at the sale, wanted and expected to purchase the property, and was willing to pay $11,180 for it, which was $3,000 more than Pease owed. He unlawfully breached this obligation. He alleged in his answer that Pease knew all about the transaction between him (Gatti) and Cryer. But he admitted before the court that such was not true. By taking advantage of the information which he had, which information he wrongfully withheld from Pease, Gatti enriched himself, and in doing so wronged Pease and inflicted injury and damage upon him, for which he must now account.

The fact must not be overlooked that in this foreclosure proceeding Gàtti, who represented the association, and Pease, one of its members, were not supposed to be dealing with each other at arm's length, but with mutual confidence that neither would take advantage of the other. Pease had a right to assume that no unfair advantage would be taken of him by the Farm Loan Association or by anyone representing it. He had a right to assume that Gatti would be fair and frank with him. Counsel for plaintiff quotes in his brief the following extract from the case of Patterson v. Holmes, 202 Ala. 115, 79 So. 581:

"The courts recognize that the mortgagee occupies a position of advantage, and the mortgagor usually occupies the position of one in necessitous condition, and thus a court will not allow undue advantage to be taken of mortgagor. The mortgagee will not be permitted to use his position to oppress or to drive an unconscionable bargain or to take any undue advantage. His conduct must be fair and frank."

This court has repeatedly held that, where there is an agreement to stifle competition at judicial sales and where one of the parties to the agreement is a party to the proceeding, the sale may be annulled by the injured party. First National Bank of Abbeville v. Hebert, 162 La. 703, 111 So. 66, and the cases therein cited.

Counsel for defendant argues that there was no stifling of competition in this case. We think there was. It is true, as counsel says, that Pease, the mortgage debtor, was present at the sale and did not bid, and that no one bid for him. In fact, there was only one bid made, and that was made by Cryer, according to prearrangement with Gatti. We have no doubt that the reason Pease did not bid on the property and had no one present to run the price up was that he did not know that Cryer was willing to pay a price far in excess of the amount of his indebtedness to the Federal Land Bank and

the Farm Loan Association. Had he known that, he could easily, and we have no doubt would, have had somebody at the sale to bid on the property and run the price up in order that he might get the benefit of his equity in the property. Furthermore, we gather from the testimony that it is likely that, if Gatti had not entered into the agreement with Cryer, there would have been competition at the sale. The testimony shows that J. M. Flenniken, a real estate agent in the City of Shreveport, became interested in the sale when he saw the advertisement in the newspaper. Flenniken testified that, as soon as he saw the advertisement, he "made a high dive for" Gatti and, when he saw him, told him that he had a prospective purchaser for the property. It developed that his prospect was Cryer. Flenniken arranged a meeting between Cryer and Gatti, at which meeting Flenniken was present. It was then agreed that Gatti should bid a sum not exceeding $11,180 for the property and resell it to Cryer at the same price. Gatti agreed to pay, and finally did pay, Flenniken, the real estate agent, a commission of $500 for introducing Cryer. Having perfected this agreement, Flenniken, of course, had no further interest in the sale. If such an agreement had not been made, it is reasonable to assume that Flenniken, the realtor, might have interested some of his other clients to bid on the property. And, as we have said, if Pease had known all the facts, he could, and no doubt would, have taken steps to protect his interest.

The defendant testified that, when he made the agreement with Cryer, he not

only was representing the Farm Loan Association but was acting for himself individually. He said that Pease was indebted unto him personally for certain amounts advanced to enable Pease to pay the installments to the Federal Land Bank, and that his purpose in taking the $3,000 note was to enable him to collect what Pease owed him. When asked to state what Pease owed him, he was able to recall only two items—one for $79.50 and the other for $25. He said that the mortgage note for $1,342.50, which Cryer executed in favor of the Farm Loan Association, was not sufficient to pay the entire sum which Pease owed the association, and that it was necessary for him (Gatti) to pay the deficit. But his own testimony shows to the contrary. He testified that the total amount due by Pease was $1,619.50, and that the association had levied a charge of $277 against the $500 stock which Pease owned in the association. Adding this $277 to the $1,342.50 evidenced by the second mortgage which Cryer gave to the association, we have the exact amount which Gatti said that Pease owed.

Scott, president of the association, and Nelson, one of its directors, said they knew nothing of the deal between Gatti and Cryer, and Gatti testified that he had not accounted to the association for the $3,000 note and did not intend to do so.

We think the trial judge did not err in ordering the defendant to render to the plaintiffs an accounting in connection with the $3,000 mortgage note. The testimony does not make it clear what the value of the $3,000 note was, and for that reason

the judge could not render a decree fixing the exact amount which the defendant owes the plaintiffs.

For the reasons assigned, the judgment appealed from is affirmed at defendant's costs.

McCALEB, J., concurs in decree.

ROGERS, J., absent.

O'NIELL, Chief Justice, concurs in the decree affirming the judgment of the district court, because the judgment goes no further than to order the defendant to render to the plaintiffs an accounting of the $3,000 note, and is therefore not really a final judgment, but the Chief Justice doubts that the plaintiffs have a cause or right of action against the defendant for any sum of money, as damages or otherwise.